UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GERALDINE A. FUHR,

    Plaintiff,                                   Civil Action No. 08-CV-11652

vs.                                           HON. BERNARD A. FRIEDMAN

SCHOOL DISTRICT OF
THE CITY OF HAZEL PARK,

    Defendant.
_____/

## OPINION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is presently before the court on defendant's motion for summary judgment [docket entry 96]. Plaintiff has filed a response brief and defendant has filed a reply. Pursuant to E.D. Mich. LR 7.1(f)(2), the court shall decide this motion without oral argument.

This is an employment discrimination action. Plaintiff Geraldine Fuhr is a teacher and athletic coach employed by defendant Hazel Park School District. In October 1999 plaintiff sued defendant in this court, *see Fuhr v. Sch. Dist. of the City of Hazel Park*, No. 99-CV-76360 (E.D. Mich.), alleging that it had discriminated against her because of her gender, in violation of Title VII of the 1964 Civil Rights Act and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), by failing to hire her as the head coach of the high school boys' varsity basketball team.[1] In August 2001 a jury returned a verdict for plaintiff, and in October 2001 the court ordered that she be instated

---

[1] The only applicants for this position were plaintiff and John Barnett. Barnett "had coached the boys' freshman basketball team for two years," while plaintiff "had been the head coach of the girls' varsity basketball team for some ten years, and coach of the boys' junior varsity and assistant coach of the boys' varsity basketball teams for eight years." *Fuhr v. Sch. Dist. of the City of Hazel Park*, 364 F.3d 753, 756 (6th Cir. 2004).

into this position. For the next five years, plaintiff worked as the coach for both the boys' and the girls' varsity basketball teams. Pl.'s dep. at 85.

On June 1, 2006, defendant removed plaintiff as the coach of the girls' varsity basketball team. Pl.'s dep. at 16, 69. In February 2007 plaintiff filed a charge of discrimination with the Michigan Department of Civil Rights ("MDCR"), alleging that "[s]ince I won a gender-based lawsuit against the employer, I have been harassed, a varsity girls' basketball job has been taken away from me, my authority has been undermined, and I have not been supported." Pl.'s Ex. CC. On this charge, plaintiff indicated she was alleging discrimination based on sex and retaliation and that the earliest discrimination occurred on April 27, 2006.

In December 2008, plaintiff filed a second charge of discrimination with the MDCR, alleging that since filing the first charge, and commencing the instant lawsuit in April 2008, "I have continuously been harassed by management, my players have been subjected to different standards compared to players in other sports." *Id.* On this charge plaintiff indicated she was alleging discrimination based on retaliation and that the earliest discrimination occurred on April 17, 2008.

In July 2009, plaintiff filed a third charge of discrimination with the MDCR, alleging that "[a]fter the filing of my most recent lawsuit in court, my EEOC charges and participation in an internal investigation, my employer has provided unsatisfactory references, . . . created a very hostile work environment in material part because of my sex, by events including but not limited to blaming me for being behind in my grading when it was not my responsibility to grade." *Id.* On this charge plaintiff indicated she was alleging discrimination based on sex and retaliation and that the earliest discrimination occurred on September 17, 2008.

In her amended complaint, filed in August 2009, plaintiff alleges that since she

2

prevailed at the first trial defendant has discriminated and retaliated against her in various ways. Plaintiff alleges defendant has subjected her to a "[h]ostile environment based on sex" by, among other things, unfairly disciplining her team members, demeaning her, constructively discharging her assistant coach, failing to provide her with "all resources she needs," and accusing her of "failing to comply with departmental regulations." Am. Compl. ¶ 11(A). Plaintiff further alleges that defendant dismissed her as the girls' varsity coach in retaliation for winning the first trial. *Id.* ¶ 11(B). She also alleges that "because of her sex," or "because of her complaints" regarding her unfair treatment, defendant conducted a biased internal investigation, has treated her differently than male coaches, and demeaned and belittled her. *Id.* ¶ 11(C)-(H). Based on these allegations, plaintiff asserts discrimination and retaliation claims under Title VII (Counts I and II), ELCRA (Counts III and IV) and Title IX (Counts VI and VII). In her response to defendant's summary judgment motion, plaintiff indicates she "is not defending the rest of her claims." Pl.'s Resp. at 41.[2]

       The essence of plaintiff's discrimination claims, under Title VII, ELCRA and Title IX, is that defendant treated her differently because of her sex.[3] The essence of plaintiff's retaliation claims, under the same three statutes, is that defendant's mistreatment of her is in retaliation for her

---

[2] These other claims are for violation of the Bullard-Plawecki Right-To-Know Act, Mich. Comp. Laws § 423.501, regarding defendant's "retention of the biased investigation in plaintiff's file" (Count V); and (2) invasion of privacy and defamation, based on the allegation that defendant failed to keep plaintiff's stress-related leave of absence confidential (Counts VIII - XII).

[3] Plaintiff alleges that defendant discriminated against her in violation of Title VII and ELCRA because "[p]laintiff's sex was a material factor that made a difference in Defendant's treatment of Plaintiff" and because "[p]laintiff was subjected to a continuing hostile environment." Am. Comp. ¶¶ 18, 23, 34, 38. In alleging that defendant discriminated against her in violation of Title IX, plaintiff quotes the statutory prohibition against discrimination "on the basis of sex." *Id.* ¶ 50.

current and prior lawsuits, her EEOC complaints and her "internal complaint against discrimination."[4]

Defendant seeks summary judgment as to plaintiff's discrimination and retaliation claims. Under Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* dispute as to any *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Viewing the evidence in the light most favorable to the opposing party, summary judgment may be granted only if the evidence is so one-sided that a reasonable fact-finder could not find for the opposing party. *See Anderson,* 477 U.S. at 248-50; *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478-80 (6th Cir. 1989). In other words, "[a] material issue of fact exists where a reasonable jury, viewing the evidence in the light most favorable to the non-moving party, could return a verdict for that party." *Vollrath v. Georgia-Pacific Corp.*, 899 F.2d 533, 534 (6th Cir. 1990).

The legal standards governing plaintiff's discrimination and retaliation claims[5] are

---

[4] The protected activity alleged under the Title VII retaliation claim is "[p]laintiff's prior lawsuit and her internal complaint against discrimination" and "[p]laintiff's current lawsuit and her EEOC complaints." Am. Comp. ¶¶ 27, 28. The protected activity alleged under the ELCRA retaliation claim is "[p]laintiff's prior lawsuit and her internal complaint against discrimination." *Id.* ¶ 42. No protected activity is alleged under plaintiff's Title IX retaliation claim; rather, it is vaguely alleged that "Defendant's actions, as described more specifically in the Common Allegations, constituted retaliation because plaintiff complained of sex discrimination . . . ."

[5] ELCRA and Title IX discrimination and retaliation claims are analyzed using the same standards as Title VII. *See Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir.2004) ("Cases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in

well known. The standards governing gender discrimination claims have been summarized as follows:

> In Title VII actions, "a plaintiff may establish discrimination either by introducing direct evidence of discrimination or by proving inferential and circumstantial evidence which would support an inference of discrimination." *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir.1997). When using circumstantial evidence to create an inference of discrimination, the complainant must carry the initial burden of establishing by a preponderance of the evidence a prima facie case of discrimination by his or her employer. In evaluating a claim of employment discrimination, we employ the burden-shifting approach first announced in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 906 (6th Cir.2002); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). A plaintiff who successfully establishes a prima facie case receives the benefit of a presumption that the employer unlawfully discriminated against him. *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089. The burden then "shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' " *Id.* at 253, 101 S.Ct. 1089 (quoting *McDonnell*, 411 U.S. at 802, 93 S.Ct. 1817). Finally, "should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* Throughout this shifting burdens framework applicable when circumstantial evidence is involved, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*; *see also Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir.1995).
>
> \*   \*   \*

---

Title VII cases"); *Nelson v. Christian Bros. Univ.*, 226 F.App'x 448, 454 (6th Cir. 2007) ("Generally, courts have looked to Title VII, 42 U.S.C. §§ 2000e, as an analog for the legal standards in both Title IX discrimination and retaliation claims"). Therefore, it suffices to state the standards that have been articulated in Title VII cases.

> . . . A plaintiff who . . . wishes to prove a prima facie case through the use of circumstantial evidence must prove four elements: (1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees. *Talley*, 61 F.3d at 1246.
>
> When proving a claim through the use of direct evidence, a plaintiff does not have to proceed under the *McDonnell Douglas* burden-shifting framework that applies to circumstantial evidence cases. *Christopher v. Stouder Mem'l Hosp.*, 936 F.2d 870, 879 (6th Cir.1991). "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir.1999). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir.2003). "[T]he evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [national origin], but also that the employer acted on that predisposition." *Hein v. All America Plywood Co.*, 232 F.3d 482, 488 (6th Cir.2000). Finally, "an employee who has presented direct evidence of improper motive does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action. Rather, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Weigel v. Baptist Hosp. of E. Tenn.,* 302 F.3d 367, 382 (6th Cir.2002).

*DiCarlo v. Potter*, 358 F.3d 408, 414-15 (6th Cir. 2004). The standards governing retaliation claims have been summarized as follows:

> In order to establish a prima facie case of retaliation, the plaintiff must show that: (1) she engaged in activity protected under Title VII; (2) the defendant knew that she engaged in the protected activity; (3) the defendant subsequently took an adverse, retaliatory action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) the protected activity

> and the adverse action were causally connected. *Smith v. City of Salem*, 378 F.3d 566, 570 (6th Cir.2004); *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir.2000); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. ----, ----, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) ("[T]he anti-retaliation provision ... is not limited to discriminatory actions that affect the terms and conditions of employment.").
>
> \* \* \*
>
> Not every act affecting an individual's employment can be considered an adverse, retaliatory action giving rise to liability. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (noting need for tangible employment action to support vicarious liability discrimination claim). Instead, to support a Title VII claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at ----, 126 S.Ct. 2405 (internal quotation omitted). In determining whether an employee's change is material, we must consider the context of the action. *Id.* at ----, 126 S.Ct. 2405. . . .
>
> Fourth, [plaintiff] must establish that there was a causal connection between the adverse employment action and the protected activity. *Morris*, 201 F.3d at 792. . . . Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection. *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 363-64 (6th Cir.2001); *Nguyen v. City of Cleveland*, 229 F.3d 559, 566-67 (6th Cir.2000).

*Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 736-37 (6th Cir. 2006).

Turning first to plaintiff's gender discrimination and "hostile environment" claims (Counts I, III and VI), the court finds that defendant is entitled to summary judgment because plaintiff has produced no evidence – either direct or circumstantial – suggesting that her gender had anything whatsoever to do with defendant's decision to remove her as the girls' varsity basketball coach or with any of the harassment she allegedly suffered. Plaintiff has not stated a prima facie

case of gender discrimination, as the only "adverse employment action" she has alleged is her removal as the girls' basketball coach, and the claim fails because plaintiff's replacement in that position, Jennifer Berrios, is not "outside the protected class." While plaintiff asserts in her response brief that she "did lose the girl's [sic] team because of her gender," she offers no evidence to support the assertion. Pl.'s Resp. at 40. She also tacitly acknowledges that the claim is doomed by characterizing it as one "of first impression" and yet offering no authority countering the long line of cases requiring that she show she was replaced by a man.[6]

Defendants are also entitled to summary judgment on plaintiff's retaliation claims (Counts II, IV and VII). Plaintiff's primary theory behind these claims appears to be that defendant removed her as the girls' varsity basketball coach, and subjected her to various forms of harassment, in retaliation for plaintiff having prevailed in her 1999 lawsuit. Insofar as they are based on this theory, the retaliation claims fail due to the long passage of time between (a) winning that lawsuit and (b) her removal as the girls' coach and the other alleged harassment. The court entered judgment on the jury's verdict on August 9, 2001, and the court ordered that plaintiff be instated "forthwith" into the position of boys' varsity basketball coach on October 11, 2001. *See Fuhr v. Sch. Dist. of the City of Hazel Park*, No. 99-CV-76360 (E.D. Mich.) (docket entries 69, 87). Defendant complied with that order and, in addition, simultaneously allowed plaintiff to retain her

---

[6] Plaintiff includes a scattershot miscellany of other allegations and arguments in the "gender discrimination" section of her response brief, none of which are properly developed or supported, e.g., "while Plaintiff was replaced by a female, it was a female who supported Defendant's attempt to drive Plaintiff out of the program"; "Plaintiff has also been passed over again for John Barnett. . . . Both applied for an assistant principal position at the junior high"; and "Girls are not offered the same athletic opportunities as boys." Pl.'s Resp. at 39, 40. The court will not consider claims and arguments which are not pled, properly briefed and supported by citations to record evidence.

position as the girls' varsity coach. Defendant removed plaintiff as the girls' varsity coach in June 2006, nearly five years after she had been instated into the position as the boys' coach. The instances of harassment, according to plaintiff's first MDCR charge, did not begin until April 27, 2006, that is, immediately prior to her termination as the girls' coach. As noted above, it is plaintiff's burden to prove that "the protected activity and the adverse action were causally connected" and this requires "temporal proximity" between the two events. *Randolph,* 453 F.3d at 737. "Temporal proximity" means that the two events be "very close" in time. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("Action taken (as here) 20 months later suggests, by itself, no causality at all"). *A fortiori*, a passage of nearly five years, by itself, suggests "no causality" stemming from plaintiff prevailing in the prior lawsuit.

Plaintiff does not argue the temporal proximity issue. Rather, plaintiff argues that defendant's motion should be denied because she has "direct evidence that Defendant retaliated against Plaintiff for winning her previous lawsuit." Pl.'s Resp. at 2, 32. The direct evidence is an alleged admission by Don Vogt, the Hazel Park high school principal, who "told [plaintiff] in no uncertain terms that she was losing the girls basketball team because the administration was still angry that she won the lawsuit." *Id.* at 1. The entirety of the direct evidence is the following excerpt from plaintiff's deposition testimony (*see* Pl.'s Resp. at 1-2) recounting a conversation she claims to have had with Vogt in November 2005:

> A. . . . I said, ever since I got placed or I won the lawsuit and got placed in this position, I have been harassed and undermined. I said, first it's Tom Pratt internally in the building. And I went through a bunch of things that he had done.
> And then I said, and then it's Clint Adkins in the community. And he screamed, Clint Adkins, he thinks he is the community. . . . He said – he said they are doing – this is a good old boys network. They are doing this to you to get even, you know. Yes, they are

9

>doing this to you to get even with you because – I can't remember exactly. They are doing this to you to get even because you stood up for your rights. They are doing this to you to get back at you for winning the lawsuit. And when he said that to me, I couldn't believe what I was hearing. I couldn't believe it because –
>
>Q. What were they doing to you that he was referring to?
>
>A. Getting rid of me for the position.
>
>Q. What position?
>
>A. The varsity girls basketball position.

Pl.'s Dep. at 417. Vogt denies having made this statement, *see* Vogt Dep. at 165-66, but for purposes of deciding defendant's summary judgment motion the court will take plaintiff's testimony at face value.

As noted above, direct evidence "is that evidence which, if believed, *requires the conclusion* that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn*, 176 F.3d at 926 (emphasis added). "[D]irect evidence of discrimination *does not require a factfinder to draw any inferences* in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson*, 319 F.3d at 865 (emphasis added). Vogt's statement is not direct evidence because it does not compel the factfinder to conclude, as plaintiff suggests, that defendant retaliated against her for her prior lawsuit by removing her as the girls' varsity basketball coach. The statement that "[t]hey are doing this to you" is ambiguous (both as to "they" and as to "this") and therefore the factfinder would have to make interferences in order to interpret it as plaintiff suggests. Further, because the conversation occurred in November 2005, fully six months *before* plaintiff was removed as the girls' coach, the need for inferences by the factfinder is magnified. Moreover, the inference plaintiff would have the

10

factfinder draw from this statement (that "they," i.e., some person or persons other than Vogt, retaliated by removing plaintiff as the girls' coach) is nonsensical in light of plaintiff's acknowledgment that it was Vogt *himself* who "made the decision" to take this action. Pl.'s Resp. at 32.[7]

In any event, Vogt's statement, as recalled by plaintiff, is not direct evidence that defendant retaliated against plaintiff for having prevailed in her 1999 lawsuit. Nor has plaintiff offered any other evidence suggesting a causal link between that case and plaintiff's removal five years later as the girls' coach or the other harassment that allegedly began around the same time as the removal. To the extent plaintiff's retaliation claims are based on her involvement in the 1999 lawsuit, defendant is clearly entitled to summary judgment.

Plaintiff also alleges that defendant has retaliated against her for bringing the instant lawsuit, filing charges of discrimination with the MDCR, and for complaining to defendant about discrimination, harassment and retaliation. All of this activity, which clearly constitutes "protected activity" for Title VII, ELCRA and Title IX purposes, *postdates* plaintiff's June 1, 2006, removal as the girls' varsity basketball coach and therefore cannot be linked to that removal.[8] Rather, plaintiff alleges that defendant, particularly through the actions of its athletic director, Thomas Pratt, has subjected her to various forms of harassment and unfair treatment apart from her removal as the girls' coach.

---

[7] Indeed, Vogt testified that "I made the decision." Vogt. Dep. at 195.

[8] Plaintiff commenced the instant lawsuit in April 2008. Plaintiff filed her MDCR charges in February 2007, December 2008 and July 2009. And her internal complaint, addressed to Don Vogt, is dated August 24, 2006. *See* Pl.'s Ex. DD (referencing an earlier "discrimination complaint" dated June 8, 2006).

11

The court has read all of the briefs and exhibits in this matter and has paid particularly close attention to plaintiff's deposition testimony. While plaintiff has described many examples of what she perceives as unfair treatment from school officials, teachers, coaches, and parents, none of it rises to the level of "severe or pervasive retaliatory harassment" and none of it has been linked to plaintiff's protected activity. Plaintiff's complaints mainly have to do with Pratt allegedly "undermining" her and failing to provide her with proper "support" as a basketball coach. Plaintiff testified that Pratt failed to order plaintiff's team's uniforms on time; failed to control the crowds at games when plaintiff was coaching; circulated a rumor about plaintiff being in the "nut house"; made negative comments about plaintiff to her assistant coach; unfairly disciplined plaintiff's players, making them miss games so that plaintiff's win-loss record would suffer and make plaintiff appear to be a bad coach[9]; failed to have the ventilation system repaired in the

---

[9] Plaintiff devotes nearly three pages of her response brief to describing one instance of this form of harassment:

> The best example of how far Defendant went to make Plaintiff look bad as a coach is Jordan Madry. Mr. Madry, a former high school varsity basketball player for Plaintiff, was a shooting guard capable of making 36 points in a game. However, in his senior year, he was forced to sit out about half of the games due to unfair discipline levied by Defendants against him.
> First, Scott Guthrie [the football coach] made up a story that he saw Mr. Madry and another student smoking marijuana off of the grounds. When Ms. Madry, Jordan's mom, was contacted by Mr. Guthrie about this allegation, it was in May. He never mentioned that Jordan would be disciplined or would miss any games, just that he was concerned about Jordan. Mrs. Madry, concerned about her son, went to the local drug store and bought an all-inclusive drug test and made Jordan take it the very day Mr. Guthrie accused him of doing drugs. It was negative! Mr. Guthrie had made the whole thing up.
> Ms. Madry learned for the first time in October of the next school year that her son was going to be forced to sit out two basketball games despite the fact that he was innocent when Mr. Vogt

swimming pool area in order to harass plaintiff and her swimmers while plaintiff coached girls' swimming[10]; increased the number of plaintiff's swim meets; would not assist plaintiff in running

---

> left a message for her. She called the school several times to tell them about the negative drug test and her calls were never returned. Defendant bypassed the normal procedure of having the coach [Plaintiff] involved in determining the discipline and instead let Mr. Barnett and Mr. Guthrie decide if Mr. Madry was going to be punished. And although following the normal policy would have only resulted in a two game suspension, for some reason that no one can explain, Mr. Madry was made to sit out three games. Even Mr. Vogt had to admit that Mr. Madry's punishment was unfair.
>
> Then Mr. Madry was threatened with assault by Dr. Mayo's [the school district superintendent's] secretary's daughter with knives because Ms. Keeton's [the secretary's] son had assaulted Jordan. Ms. Keeton decided to take out her anger against Mr. Madry and photoshopped some two-year-old pictures of him drinking at her house. She had provided the alcohol to the minors and there were several other student athletes who were in the pictures with him who were photoshopped out. Although Mr. Vogt knew that other student athletes had been involved in the drinking, that the drinking was a very old offense, and what this was all about, Mr. Vogt told Jordan and his mom that he had to discipline Jordan because "he had a boss to answer to." Mr. Madry was forced to sit out another 6 games his senior year and no other student athlete was disciplined.
>
> A couple of months later, Ms. Keeton's daughter was caught drinking. She was only required to sit out 1 game, not two as required by the policy. Moreover, her coach, her aunt, was allowed to choose which game she sat out so that it would have the least affect [sic] on the girls' varsity team.
>
> Unfortunately this was not enough targeting by Defendants. Although everyone testified that attendance violations should not result in being suspended from games, Mr. Madry was required to miss a game for attendance. Worse still, the attendance violation was fabricated. He had properly dropped a class but Defendant continued to count his failure to attend this dropped class as an absence each and every day.

Pl.'s Resp. at 11-13 (footnotes and citations to exhibits omitted).

[10] Plaintiff devotes two paragraphs of her response brief to describing this incident:

13

her practices, but he did assist plaintiff's replacement, Jennifer Berrios; failed to have an ice machine repaired; once failed to schedule a bus to transport plaintiff's swimmers to a meet, making them 45 minutes late; and failed to give plaintiff advance notice when the pool was going to be closed for repairs. Plaintiff also testified that Vogt and Meisinger, the school district's deputy superintendent, believed Pratt when plaintiff complained to them about him; and that Barnett, the teacher whom plaintiff replaced as the boys' coach when she was instated into that position, and the junior high coaches told potential basketball players that plaintiff was a bad coach. Such incidents, while perhaps indicative of personality conflicts, discourteousness and workplace stress, simply do not qualify as "severe or pervasive retaliatory harassment" so as to give rise to liability under the civil

---

> Since being removed from the girls' varsity basketball team, Ms. Fuhr has tried to mitigate her damages by applying for other coaching positions. One position Defendants were forced to give her was the girls' varsity swimming team coach position. In the summer of 2008, the swimming area became dangerously hot. The student-athletes and the parents complained that the area was so hot that they were having trouble breathing. The school engineer describes the area as being like a sauna. She brought this trouble to Mr. Pratt's attention and his response was that nothing needed to be done, despite the fact that the swimmers were complaining about being nauseous and having trouble breathing.
>
> Finally, two months later, Ms. King, the engineer convinced her superior to come to the pool area. The situation was so dire that it was determined that the pool area needed to be fixed that same day. When Mr. Pratt learned that the pool problem was to be finally be [sic] fixed, he sarcastically responded, "Oh yes, we don't want Geri Fuhr complaining." In the end, it was discovered that a belt had broken on the air unit and that removed the old air and brought the fresh air in. For two months, the girls' swim team had been required to swim in recycled air that grew hotter and hotter, jeopardizing their safety and Mr. Pratt knew about it and did nothing because Plaintiff had been the one who had reported the problem.

Pl.'s Resp. at 15 (footnote and citations to King Aff. omitted).

14

rights statutes plaintiff has invoked.  As the Supreme Court has stated,

> The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm. As we have explained, the Courts of Appeals have used differing language to describe the level of seriousness to which this harm must rise before it becomes actionable retaliation. We agree with the formulation set forth by the Seventh and the District of Columbia Circuits. In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Rochon*, 438 F.3d, at 1219 (quoting *Washington*, 420 F.3d, at 662).
>
> We speak of material adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); see *Faragher*, 524 U.S., at 788, 118 S.Ct. 2275 (judicial standards for sexual harassment must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing'"). An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. See 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed.1996) (noting that "courts have held that personality conflicts at work that generate antipathy" and "'snubbing' by supervisors and co-workers" are not actionable under § 704(a)). The antiretaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. *Robinson*, 519 U.S., at 346, 117 S.Ct. 843. It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. *Ibid.* And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence. See 2 EEOC 1998 Manual § 8, p. 8–13.

*Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006).  *See also Michael v. Caterpillar Financial Services Corp.*, 496 F.3d 584, 600 (6th Cir. 2007) ("federal courts are generally not in the business of refereeing such common workplace conflicts").

As the harassment alleged in this case was not "severe or pervasive," plaintiff has failed to state a prima facie case of retaliation. Nor has she produced any evidence of causation (other that Vogt's statement, discussed above) – beyond general temporal proximity[11] – linking the harassment with her protected activity. Plaintiff's only attempt to establish causation is to point to the harassment itself, *see* Pl.'s Resp. at 35, but not, as the cases require, "a temporal connection coupled with other indicia of retaliatory conduct." *Randolph,* 453 F.3d at 737.

For the reasons stated above, the court concludes that plaintiff has failed to state a prima facie case of either gender discrimination, hostile work environment, or retaliation under Title VII, ELCRA or Title IX. Accordingly,

---

[11] Plaintiff does not attempt to show a causal link between any specific protected activity (i.e., the commencement of the instant lawsuit, the filing or her MDCR charges, or sending Vogt her letters complaining about harassment) with any specific instances of harassment. Rather, plaintiff's argument appears to be that the harassment has been of a continuing nature that began long before she engaged in any of this protected activity. In her August 24, 2006, letter to Vogt, for example, plaintiff asserted the "issues arose" "[t]hroughout the last five years." Pl.'s Ex. DD. Plaintiff does not establish temporal proximity by showing that the harassment at issue has been occurring since sometime in 2001 and that plaintiff has been engaged in protected activity since June 2006. The evidentiary significance of close temporal proximity – "very close," in fact, *Breeden*, 532 U.S. at 273 – is that it gives rise to an inference that the harassment was triggered by the protected activity. No such inference can be made when, as here, both the harassment and the protected activity allegedly occurred over a period of years, and only partially overlapping years at that.

IT IS ORDERED that defendant's motion for summary judgment is granted.


                                              S/Bernard A. Friedman
Dated: September 19, 2011         BERNARD A. FRIEDMAN
      Detroit, Michigan          SENIOR UNITED STATES DISTRICT JUDGE